May it please the court, Lee Marshall on behalf of the appellants. First of all, I'd like to apologize on behalf of Mr. Hirsch, who had intended to argue this case, but he had a late-breaking conflict and asked us to step in. In light of Monday's bankruptcy and the order of the court from yesterday dealing with the automatic stay, I've been asked to address the bankruptcy and stay issues. And with permission of the court, Mr. Sheely, who was involved to some extent, will address the merits. And I'll keep my comments as short as possible. I did provide, through the clerk this morning, a list of some additional citations that deal with the bankruptcy and stay issue. What's your position on it, just to cut to the chase? Well, our position essentially is that we would prefer to proceed with the appeal, and I'm authorized to represent on behalf of WVSV that it will shortly go to the bankruptcy court and seek a lift of any automatic stay that applies. They may not have to. The stay applies for cases against them. But if prudent, that might be right. So your position, you want to go forward? Exactly, Your Honor. So either way, we would prefer to proceed. And just for the avoidance of doubt, we will do that and notify the court once that process is finished. I can certainly address any questions that you may have about the stay. Yeah, I think there was a, if I'm not, I may be recalling this incorrectly, but it seems to me there's a second or third circuit case that actually addresses the question of when a case is on appeal. But you haven't run across that yet? There's actually a ninth circuit case that addresses that. And I did not list that one, but I did read it yesterday. It's called Parker v. Bain. Okay. And I actually might have a citation. It's 68F3-1131, and it's a 1995 decision from this court. And it says that the automatic stay provision should be read to stay all appeals and proceedings that were originally brought against the debtor, regardless of whether the debtor is the appellant or the appellee. Okay. So at least as to that point, it's directly on point, Your Honor. I think we have your position. And why don't you sit down, and if they contest it, we'll give you some rebuttal time on that. Very good. Thank you. Thank you. Appreciate you coming. Thank you. Good morning. May it please the Court, I'm Robert Sheely here on behalf of the defendant appellants. I'd like to start out just by giving the Court, it's in the record, but an overview of the uniqueness of this particular piece of property. It's an 11,000-acre, huge acreage, master plan community, which has been in development for 15 to 20 years as a master plan development. And it's been slowed down by the economic recession. There's not much going on out there right now, and there hasn't been the past four or five years. This case has a date of appraisal as of June 2008, which is right at the really heart of the recessionary period, particularly in Phoenix, where land transactions really slowed down. Is this north Phoenix? I'm sorry? Where is it from, Phoenix? It's west of Phoenix. Okay. Yeah. It's a big master plan, the next development out toward the west. Okay. And what happened was Transwestern received permission to put in this pipeline from basically running north up in Ash Fork, if you know Arizona at all, up along I-40. And there's literally a 50-foot strip that runs from I-40 all the way south. You can see it as you're driving on I-17 north. A 50-foot just looks like denuding of the ‑‑ just a scar, just denuding of the land for X miles, 50 feet wide. And that 50-foot-wide strip runs right through the middle of this master plan community. Now, there are no other master plan communities that our experts were able to find or that we were able to find that have a 50-foot strip with a high-pressure natural gas pipeline splitting through the middle of it, which makes this particular case factually a very difficult valuation case because there are no comparables. And our expert, who's 40 years in the business, said there are no comparables that I think that I can use under ordinary appraisal statutes because given the size of the property, the location of the pipeline, the uncertainty of the market at the time, given it was 2008, and the lack of sales even within the property because of the slow market, he had to figure out what a hypothetical buyer would have done in a hypothetical sale at a hypothetical date, which the parties had agreed to would be June of 2008. And what he concluded was that from a factual standpoint, the standard kind of comps where an appraiser goes out and gets similar comps and adjusts them up and down wouldn't work. He's been 40 years in the business, as I said, and he concluded that he had to use some other approved appraisal methodology to come up with a proper appraisal of the property, which is what he did in this case. There's no question from a historic and public standpoint that there has been some concern both nationwide and in particular communities about the impact of a high-pressure natural gas line. The court's familiar with not too far from here several years ago when a gas line exploded, and there is a public perception. The evidence would show that, the factual evidence and the reliance of the experts in their work. And when public perception of a hazard or danger threatens to diminish the nature or the value of the property, then the court and the jury are allowed to take that diminution in value into consideration. So we have really a fundamental cross here. Daubert does apply. There was some cross-chatter in the briefs about whether Daubert would apply. We clearly think it applies in its progeny. Kumo Tire does as well, and Ninth Circuit law on it. So clearly it's a Daubert issue. And clearly the question for your honors is where in a – Daubert has to be applied particularly in a very fact-specific context of a case. There is broad guidance out there from the courts, but there's no other cases that we could find in which this type of analysis done by Mr. Chalmers and others came up for review in a court in this type of property. So the court has to, when the district court, the learned court, has to make a decision as to what role it's going to play and how far it's going to get into the province of the jury in terms of determining the reliability of the opinions at issue. So, again, I think the question for your honors is where in a –  And clearly the question for your honors is where in a –  And clearly the question for your honors is where in a – can I interrupt you? Yes. We've got three possible experts. We've got – let me make sure I've got the names right. We've got Mr. Dowdy, who worked for a time for Buckeye in the planning department. Yes. We've got Mr. Chalmers, who is the appraiser. And we had the environmental expert, his name I'm – Mr. Wolfe, right? Wolfe, yes, sir. Now, the district judge said as to Mr. Dowdy, well, he doesn't have any expertise sufficient to qualify him as an expert to determine what discount a buyer would attach to the likelihood of an 80-foot – excuse me, 800-foot sort of protected area, and therefore I won't allow him. He said as to Mr. Wolfe, well, his expertise really is – environmental expert, his really is as to air quality. And I'm not quite sure I – and I understand both of those. I'm not quite sure I understand the objection that proves convincing to the district judge with respect to Mr. Chalmers was he clearly is an expert appraiser. I mean, he's got a Ph.D. in economics. He's got an appraisal company. He's been doing this for a long, long time. The objection is that this is not something that's susceptible to an assessment by an appraiser. I'm sorry. I'm a little hard of hearing, Your Honor. Say that again, please. The problem that the district judge had is that despite the obvious fact that Mr. Chalmers is an appraiser for a living, that this is simply – the evaluation is not susceptible to assessment by an appraiser? Well, that's not what the judge wrote. And what we are here about and what we were concerned about from the district court below is that he went beyond that and he started to say that the methodologies used weren't appropriate and that he didn't have the experience and he didn't show what he relied on when he came up with his opinions. And the point that we're making is that he is an appraiser with 40 years' experience. He did say that the usual methods of using comparable properties were not available, but he was willing to express opinions based on what he considered to be acceptable appraisal methodologies. And we contend that the court replaced its judgment of the merits of those decisions rather than letting the jury decide the merits of those decisions. Mr. Chalmers, as I understand it, assumed that there was going to be at least a possibility of an 800-foot setback. Is that right? What he assumed was that participants in the market, particularly in a down market, in a buyer's market in 2008, in an environment in which pipelines had exploded, that there would be a perception among developers that they could get a discount in the property because nobody could say whether or not the town of Buckeye would or would not impose an 800-foot extension on both sides of the right-of-way. And so because there was uncertainty in the market and because there was a buyer perception or would be a buyer perception in a down market about what the city of Buckeye ultimately would do with regard to a setback. And there was discussion at the town of Buckeye with regard to setbacks. They did not ultimately impose a setback. But the question goes back to what would a knowledgeable buyer have known at the time and what would a knowledgeable buyer have perceived and what would a knowledgeable buyer have argued in terms of negotiating a price at the time. And we think there's strong evidence. And are we talking about a retail buyer or a particular lot within the development or are we talking about somebody who's going to buy a lot of the development and then develop that subdivision within it? I mean, what buyers are we talking about? The buyers we were talking about would be at a wholesale level, would be people, for the most part, buying property. I'm sorry? To buy the whole development. Would buy chunks of development. There were villages within a development and they would buy chunks and they would say, we're going to be up against this pipeline. Those developers would themselves have the issue of selling the lots right closest to the pipeline, I think, themselves. But what we're talking about was ultimate developers coming in and saying, I perceive that there's a risk here. Risk is discount. And we think that there could be a problem. Pipelines do explode. We think that our buyers are going to be concerned about being, especially in a subdivision, a residential subdivision, that our buyers are going to be concerned about buying a house along here, and we're concerned about what the city ultimately may do. And all of that equals risk and all of that goes to diminution in value. And we think that Mr. Chalmers was eminently qualified to make that, to make those decisions and eminently qualified to opine in a court. Now, the judge always, of course, is going to have, in a matter like this, the ability to do a lot of things to control it. If he thinks the opinion isn't right or isn't foundation, he can sustain objections. He can instruct the jury. He can ultimately overturn the verdict if he finds that the evidence doesn't support the verdict. But our position is that in a case of this uniqueness and of this size, that those decisions belong to the jury, not to the judge, who we think, with all due respect, preempted the role of the jury. So the 2.8 that was the bond, is that the ultimate judgment of condemnation in this case? Yes. What happened was the parties, I think, stipulated to an immediate possession amount. That amount is a floor. You don't have to come back and pay that money back. I see. The ultimate amount that was for the judgment of condemnation was in the 330 range, which was for, based on- 330,000? 330,000, something in that range. It's in our briefs, exactly what it is. Okay. Which was for value of the 50-foot strip and another little piece of property that they took for temporary use. So that ended up, after the judge, frankly, his rulings gutted the case, and there was nothing left to say in summer judgment. Now, as to Mr. Dowdy, I just wanted to say one quick word about him. We didn't offer him to come in and talk about what the discount value would be. What we offered him to say was, I am an urban planner, which he is. He's by college degree and experience. And as an urban planner, he would say to the jury, there are market perceptions amongst developers who would ask these questions and raise these issues. And that's all he was going to come in and say. And, again, we think the fact that he was only out there for five years or he didn't talk to some developer are all great fodder for cross-examination, but not fodder to exclude the witness from testimony. I've got about 25 seconds left. I just want to say, with regard to Mr. Johnson as the owner, a corporation can only, of course, testify an owner through a person. Mr. Johnson was, under the facts, the most highly qualified person, most familiar with the property, and was, in fact, an owner of the ultimate LLC – pardon me, a manager of the ultimate LLC that took over. I'm out of time, and I appreciate the court's attention. You bet. May it please the Court, my name is John Eckbert. I represent Transwestern Pipeline Company. With respect to the initial issue about the bankruptcy automatic stay, our position as well would be that if there is a way that we could proceed to have this heard, we would like to do that. And if their solution works, then we – Okay. Very good. Okay. With respect to the merits of this appeal, let me start by making just a fundamental point, and that is that the – in this issue, the standard of review is critical. It is an abuse of discretion standard, and the – this Court's discussion about what abuse of discretion means in terms of being implausible, illogical, or not supported by any inferences is applicable. Let me start with Dr. Chalmers, because I think that's the one that really is the closest they come to trying to tie their evidence of severance damages to actual public perception. And that's what, after all, this case is all about. Was there a perception in the marketplace that this pipeline going through this property will not affect – we're not talking about the value of the property that was actually taken for the pipeline. We're talking about the impact that may or may not have had on all the rest of the company. And so Dr. Chalmers' job normally, an appraiser would do that, would come in and say, look, I've done comparable properties. I've compared those with ones affected by pipeline, those that aren't, and here's the trend. Here's what kind of impact that has. In fact, Dr. Chalmers testified, and it's in the record, we cite it in our briefs, that that's what you have to do in order to have a reliable opinion by an appraiser. But in this case, what Dr. Chalmers came in and said, well, you know, our property is really different in this situation. It's so different that that's not really going to work anymore for us. Now, he doesn't cite any authority that supports his concept that once you get so different, then you reach a threshold, all of a sudden you just throw out that normal process, which he says, in other contexts, is what you have to do. He just says, we're going to throw it out. There's no evidence, there's no reliable citation to any other appraiser ever saying that's what you do. Land, by definition, is never the same. There's always differences. You always have to make adjustments up or down when you're doing comparisons. So to simply say that this one is so different that there's no way to go through that normal, approved, accepted, reliable process, methodology. Let me ask it this way. If it is true that there really are no comparables, and this strikes me at least as an unusual situation where you've got this huge area that's planning for development, you've got a pipeline that's going to go through the middle of it. If it's true that there really are no comparables, does that mean that Dr. Chalmers' opinion shouldn't be listened to at all because there are no comparables and you can't apply the normal methods that an appraiser would do? Your Honor, I think there's two responses to that. One is we're simply not willing to accept the concept that there are no comparables because you can always do a bigger adjustment if it's really a lot different from other situations. So, but it at least gives you a baseline statistical, factual, number-based place where we can now have a debate. And then we get into that situation where we've got two experts coming in front of a jury and the jury gets to decide. So where were the comparables? I'm sorry? Where are the comparables in your estimation? Well, there were comparables. There were these matched pair studies that were done by our expert witness, for example. Now, they could, and that testing, statistical testing, which is the normal done in this context, is revealed that there was in fact no systematic valuation impact of having this underground pipeline affecting all the other property. And so, you know, our guy came in and said there is comparables and it can be done and it was done. But the second part to your question, Your Honor, is that let's assume that he comes in and says there are no comparables, which in fact is what he said. And therefore, not only do you have to have something that would show that that's a reliable thing for an expert to say, an appraiser who builds his life doing exactly what he's saying I can't do now, that's what he normally does, he says I can't do that here, is there anybody else out there in the world, in his peer, is there any articles, is there any studies that have been done that adopt that view? There's nothing in the record that supports that. But even if there were, even if you could say that we're just going to abandon that, you have to still, you still bear the burden of replacing it with something that's reliable. That's what the district court's job is to do here as the gatekeeper, is to not let something come in, even if we could get past the first step of saying, okay, there's nothing, you know, I can't do anything with the normal process. You still have to say replace it with something that isn't junk science. You have to, you just can't say I'm going to pick numbers now because I've been doing this for 40 years. I take it we're always torn in these cases or faced with whether the district court is weighing not admissibility, but credibility. And you're saying, as I hear it, that you have to at least have some methodology, you can, somebody could disagree with it, but you have to have some range of acceptable methodology on which you put your numbers. We really are talking about methodology, Your Honor, here. This is not a situation where the judge simply said, I don't agree with your conclusion. Well, he did say he quarreled about the setback. Well, he did quarrel about the setback in the sense that there was no evidence. First of all, there is no setback. There is no setback anywhere in the nation. But that's, well, that's not purely a method of methodology. I mean, that's, that may go to cross-examination. But, Your Honor, it's that combined. Let me put it this way. If he'd done a comparable market analysis and he had the setback in there, his testimony would go in. No question. Yeah. No question. Because what he's then doing is he's then finding a legitimate, respected, accepted method of measuring the risk that there would be a setback at some time in the future. That's what an appraiser is supposed to do. He could, he said he couldn't do that here. And then he tried to replace it simply by saying, based on 40 years of experience and there's no question, we're not questioning whether he's a qualified appraiser. And the judge didn't say he wasn't qualified. The judge said what he was trying to render as opinions were not reliable opinions. And some of his opinions did come in? I mean, he kind of split them, correct? Yes. Yes, Your Honor. He did testify about the valuation of the property that was taken. And, but, you know, those were all done in kind of the normal ways as opposed to simply now saying, I'm going to say 80 percent of the value of the land within this hypothetical 800-foot setback would have been lost as a result of the fear of this 800-foot setback. And I'm going to say 10 percent. He's picking numbers. He's picking percentages. That's not what appraisers do. That's not what courts allow appraisers to do just based on picking percentages. And here the court, the district court said there's nothing reliable about that. He doesn't point to anywhere where there's ever been a situation where an appraiser says I just can't do a comparable. You know, even if he were to say I'm going to quadruple it. I'm not sure the failure to produce a comparable is, sorry, I tend to lean back and then you can't hear me. I'm not sure that the failure to produce a comparable is necessarily fatal in my view because I've seen a lot of appraisals where you say this property is so unique there's no comparable and needs some different method of analysis. I'm a little more sympathetic to the argument that I just, it's hard to see where the 80 percent figure comes from. But I think to say he has to use comparables and he can't say there's no comparable, I'm not sure that's a Dobbert issue. Let me add something that I think would be helpful to that point. And that is we're not saying that that was the only way. We also are pointing out and we point out to the judge and the judge understood that he didn't go out and talk to any players in the marketplace either about this situation. It's not like, you know, there are ways to do market analysis that's different from just the match pairs. You could go out and you could do surveys. You could go talk to people and say, you know, if you were the buyer here, how would that impact you? But I thought that was sort of the point of their theory of using the urban planner to say this has an impact on urban planning as a foundation for that conclusion.  Oh, I know he didn't, but I'm just saying. You can't piece together several different unreliable, you know, opinions with no foundation and then create a foundation as a result of that. Well, I'm not sure it would have been any better to go talk to buyers. I mean, if you survey buyers at a theoretical property, they say, yeah, I might be afraid of it. I mean, that's — I take your point, but I'm not sure — I think you'd be making the same argument had they done that. Well, I'm not sure that we would have, Your Honor, in all candor. I think the absence of anything other than picking a percentage saying that my feel is 80 percent and my feel is 10 percent, that's — what do you do with that? Is that reliable? And I guess the bottom line where I started out the conversation was in the context where the district court judge gets the benefit of the doubt, unless he's abused his discretion, is it illogical for him to conclude that that was unreliable? Is it, you know, completely baseless in the inferences that can be drawn from the record? You know, I don't think so. I think that in our situation where we're now on review with an abusive discretion standard, I think the judge was well within his discretion in deciding, Dr. Chalmers abandoned what he normally does, what he says needs to be done by his own admission, and hasn't replaced it with anything reliable, nor does he say — offer any support that it would — that abandoning it is a legitimate method. No, I understand that, and normally we take expert testimony in the context of a total trial. As you understand, it has the harsh consequence here of depriving them of any ability to put on evidence at all. Yeah. And particularly, you know, the owner evidence, of course, which is people generally allowed, was disallowed for a technical reason, maybe a good reason, but they had no case after. There was the gut of their entire case, so it's a slightly different circumstance. And I appreciate — I know your citation that says it doesn't matter, and you can get the case and the summary judgment is appropriate, but it's a disturbing — I think Joyner tells us that. Yeah. The Supreme Court case in Joyner was that situation. Because of the striking of the expert, excluding the expert as unreliable, then there was no case, and it was a summary judgment kind of situation. I don't think that changes the standard of review or the discretion that's accorded to the trial court judge in those circumstances. You know, I also would — I think I just want to spend a moment talking about Mr. Dowdy, because I think it's important to recognize that the trial court judge did both, said that he wasn't qualified in the first instance, but then also said even if he were qualified, his — again, his opinions are not reliable. And what he was attempting to testify about was whether or not, you know, what was the likelihood that the town of Buckeye would, in fact, adopt a 100-foot setback. And he also then was trying to testify about the fact that market participants would take it into account. I mean, he wasn't quantifying it. You know, he left that later for Dr. Chalmers. But, you know, he again, on what basis was he trying to tell the Court that market participants would, in fact, take it into account? You know, as to the second, that market participants will take it into account, that's sort of a two plus two is four. Of course they'll take it into account. The question is how much of a discount will they attach to it. So, I mean, that's a no-brainer. But the first one, that is to say whether he had sufficient expertise as to be an expert competent to testify as to the likelihood of a setback. Is there anyone more competent than someone who has served as part of the planning department in Buckeye? Now, maybe you can respond, but he was there as a young man and only for a brief period and so on. But I'm interested in your view as to where you would find someone competent to testify as to the likelihood that the town of Buckeye would impose this 800-foot setback. Again, two responses, Your Honor. The first one is that I guess I would raise a question whether that's something that would be appropriate for expert testimony. Okay. About whether any expert should be allowed to testify about the prospects of an elected town council in the future doing something like that, whether anybody has expertise along those lines. Fair enough. Okay. And then the second thing is Mr. Dowdy himself, and again, it's cited in the briefing, said that it's just purely subjective. It's guesswork. He doesn't know. His own testimony was that he doesn't know. The only thing I'd say is that in condemnation cases that typically you let the owner testify, even though it's wildly speculative, even though it's without foundation, that's just the tradition in the West. The rancher gets up there and says, yeah, I talked to Buck on the next property, and he said he wouldn't buy my place, and he was interested two years ago or something. I mean, usually you let them testify. That's just it. Yeah. Even though they have made less experience or foundation than this particular witness. Your Honor, I'm out of time. No, but Judge McKeown had a question. But I just, to your point, you shifted to Mr. Johnson, which is not somebody we were talking about. We were talking about Mr. Dowdy in this. I just want to make sure we're keeping the player straight. Right. I was on a slightly different point. Judge McKeown had a question. That's fine. Go ahead. I'm fine. All right. Very good. Thank you. Thank you. Yes. We talk in our briefs at two places where Mr. Chalmers came up with the 80 percent. He didn't just pull it out of thin air. Our opening brief at page 42 talks about Mr. Chalmers explained that he based his 80 percent figure on his professional experience and Arizona State Land Department guidelines relating to easements, and it gives a report, a cite to his report.  We also talk about it in a little more briefer fashion in a reply, and I don't have the page to that. But, oh, here it is on page 6. We said, however, Dr. Chalmers explained that how he chose a figure by relying upon the factual record, a percentage is used by the State of Arizona when valuing real estate encumbered by easements, the loss of value, the severance value in an easement, using by analogy. The second thing I'd like to say, and then I'll sit down, is that the, quote, mixed mass pair analysis to which counsel referred was literally somebody looking at the sale of single lot residential homes with and without a pipeline running through them. And that's not the type of comparable that's effective here. The type of comparable that we would have to find would be sales of large properties by developers in a large master-planned area, and it's a totally different world. So Mr. Chalmers didn't just make up numbers. He didn't make up a methodology. He used a method that he felt was appropriate given the factual circumstances, and factual circumstances are what ultimately control here. Thank you. Thank you both for your arguments. The case will be submitted for decision and will be in recess for the morning. Thanks again. Safe travels.
judges: Thomas, McKeown, Fletcher